IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:08-CV-396-FL


| | |
|---|---|
| AMERICAN PETROLEUM INSTITUTE, and NATIONAL PETROCHEMICAL AND REFINERS ASSOCIATION,<br><br>        Plaintiffs,<br><br>    v.<br><br>ROY A. COOPER, III, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA,<br><br>        Defendant,<br><br>and<br><br>NORTH CAROLINA PETROLEUM AND CONVENIENCE MARKETERS ASSOCIATION,<br><br>        Intervenor-Defendant. | ORDER |


This matter comes before the court on defendant's and intervenor-defendant's motions for

summary judgment pursuant to Federal Rule of Civil Procedure 56 (DE ## 84, 86).[1]  Plaintiffs

timely responded in opposition, and defendant and intervenor-defendant replied.  For the following

reasons, defendant's and intervenor-defendant's motions are granted.

---

[1]  Intervenor-defendant joins and supports defendant's motion for summary judgment, and did not file separate or additional memorandum of law.

## STATEMENT OF THE CASE

American Petroleum Institute ("API"), a national trade association of approximately 400 corporate members that represents America's oil and natural gas industry, and National Petrochemical and Refiners Association ("NPRA"), a non-profit trade association that represents American refiners and petrochemical manufacturers, seek declaratory and injunctive relief allowing their members to retain the ability to sell only ethanol-blended gasoline to distributors and retailers in North Carolina, notwithstanding the prohibitions in the North Carolina Act of July 14, 2008 ("Ethanol Blending Statute"), 2008 N.C. Sess. Laws 222, signed into law August 17, 2008.[2] Plaintiffs contend that the Ethanol Blending Statute is preempted by several federal statutes and violates the Commerce Clause of the United States Constitution.

Plaintiffs named Roy A. Cooper III, Attorney General of North Carolina, as defendant in this action. On February 27, 2009, the North Carolina Petroleum and Convenience Marketers Association ("NCPCMA"), a statewide trade organization composed of approximately 300 businesses engaged in the marketing of petroleum and convenience products, was allowed leave to intervene as a defendant.

On October 2, 2008, plaintiffs moved for summary judgment as to their facial challenge to

---

[2] The Ethanol Blending Statute provides in relevant part: "A supplier that imports gasoline into the State shall offer gasoline for sale to a distributor or retailer that is not preblended with fuel alcohol and that is suitable for subsequent blending with fuel alcohol." N.C. Gen. Stat. § 75-90(b) (2008). It also provides:

> The General Assembly finds that use of blended fuels reduces dependence on imported oil and is therefore in the public interest. The General Assembly further finds that gasoline may be blended with fuel alcohol below the terminal rack by distributors and retailers as well as above the terminal rack by suppliers and that there is no reason to restrict or prevent blending by suppliers, distributors, or retailers. Therefore, any provision of any contract that would restrict or prevent a distributor or retailer from blending gasoline with fuel alcohol or from qualifying for any federal or State tax credit due to blenders is contrary to public policy and is void. This subsection does not impair the obligation of existing contracts, but does apply if such contract is modified, amended, or renewed.

Id. § 75-90(c) (2008).

the Ethanol Blending Statute. Defendant and intervenor-defendant also moved for summary judgment, in motions filed May 22, 2009. The parties negotiated joint submission of certain factual stipulations for use in deciding plaintiffs' motion for summary judgment.

On January 27, 2010, the court denied plaintiffs' motion for summary judgment and granted the motions of defendant and intervenor-defendant in corresponding part. The court held that plaintiffs had standing to bring this action, but that the Ethanol Blending Statute was not facially preempted by the Federal Renewable Fuel Program, the Lanham Act, the Petroleum Marketing Practices Act ("PMPA"), and that it did not interfere with the Commerce Clause. Following the court's order, the parties engaged in discovery on plaintiffs' as-applied challenge to the Ethanol Blending Statute.

On August 29, 2011, defendant and intervenor-defendant filed separate motions for summary judgment. Once again, the parties provided stipulations of fact relevant to the court's determination, which supersede the earlier stipulations.[3] Defendant and intervenor-defendant argue that the stipulations confirm that the Ethanol Blending Statute is not preempted by federal law and that it does not violate the Commerce Clause. Plaintiffs timely responded in opposition on September 28, 2011, arguing that defendant and intervenor-defendant are not entitled to summary judgment on plaintiffs' preemption claims or commerce clause claims, and that genuine issues of material fact remain as to whether the Lanham Act preempts the Ethanol Blending Statute, whether the federal renewable fuel standard program preempts the blending statute, whether the PMPA preempts the blending statute, and whether the Ethanol Blending Statute violates the Commerce Clause. Defendant and intervenor-defendant replied.

---

[3] The most recently filed stipulations are lodged on the docket at entry 83.

3

## STATEMENT OF THE FACTS

The parties stipulate to certain facts that may be assumed to be true for the purposes of this action, memorialized in an extensive list lodged on the docket at entry 83. The court briefly summarizes the facts relevant to its ruling herein.

There are two types of gasoline relevant to the instant case - conventional gasoline, which does not contain ethanol, and ethanol blended gasoline (E10), which does. (Stip. ¶ 3.) There are many actors involved in extracting, preparing, shipping, and ultimately selling gasoline. For purposes of this order, the relevant actors are divided into two groups, suppliers and marketers. Plaintiffs represent various suppliers, who supply petroleum products to marketers in North Carolina. (Stip. ¶ 1.)[4] Intervenor-defendant represents various marketers, which include retailers and distributors, as those terms are defined in the Ethanol Blending Statute. (Stip. ¶ 2.) A federal tax excise credit currently known as the Volumetric Ethanol Excise Tax Credit ("VEETC") allows a party that blends ethanol with gasoline to claim a credit against its gasoline excise tax obligations to the Internal Revenue Service. (Stip. ¶ 144.) At its core, this case involves a dispute over who blends conventional gasoline with ethanol in North Carolina.

The North Carolina Ethanol Blending Statute requires that suppliers must offer for sale to marketers gasoline unblended with ethanol that can be blended with ethanol. See N.C. Gen. Stat. § 75-90(b). Additionally, the statute prohibits any contract provision between suppliers and marketers that restricts or prevents blending by marketers, and therefore prevents marketers from receiving a federal or state tax credit for doing so. Id. § 75-90(c).

---

[4] For purposes of this order, "suppliers" includes refiners.

There are multiple ways to blend gasoline and ethanol to created blended product.  Suppliers currently manufacture various forms of unblended gasoline, including full octane gasoline suitable for use in vehicles as well as "blendstock," a petroleum product with an octane lower than its final intended octane level, which can be reached after it is blended with 10% ethanol.  (Stip. ¶ 4.) Blendstock with a lower octane content, such as 84-octane, is not suitable for use in vehicles as fuel.  (Stip. ¶ 28.).  Suppliers ship these gasoline products to North Carolina primarily through petroleum pipelines.  If a marketer wants to purchase blended E10 at the terminal from the supplier, the unblended gasoline is transported to a designated tank and blended through a computer-controlled and automated system with the appropriate amount of ethanol plus the supplier's additives.  The blended E10 is deposited from the terminal rack into a valve in the marketer's vehicle.  This process is called "inline blending."  (Stip. ¶¶ 70, 71.)

If, however, a marketer wants to blend the E10 himself, he must engage in a process called "below the rack" or "splash blending."  (Stip. ¶ 72.)  The marketer puchases the conventional gasoline from the supplier, and then adds ethanol into the unblended gasoline "below the rack" into a valve at the bottom of the marketer's transport vehicle.  (Id.)  With regard to these two forms of blending, the parties stipulate that records reflect that various problems have arisen both with splash blending and inline blending, which problems typically involve too much percentage ethanol in blended gasoline.  (Stip. ¶¶ 86-120).  The parties also stipulate that there is no evidence in the record that errors in splash blending have resulted in harm to consumers.  (Stip. ¶ 121.)

Through the end of 2010, the blending statute had not materially affected the number of different petroleum products that suppliers had to ship to terminals in North Carolina to offer a full slate of gasoline products.  (Stip. ¶ 49.)  Additionally, suppliers have not, to date, experienced any

5

supply problems due to North Carolina marketers seeking to purchase unblended conventional gasoline (Stip. ¶¶ 67, 69.)

Under federal law, each gallon of renewable fuel, i.e., ethanol, is assigned a Renewable Identification Number ("RIN") by its producer, and that RIN must be transferred along with the renewable fuel until it is blended with gasoline or diesel fuel. (Stip. ¶ 138.) A party that blends renewable fuel with gasoline or diesel fuel may separate the associated RIN. Under standards promulgated by the Environment Protection Agency ("EPA"), suppliers must acquire these separated RINs to demonstrate compliance with renewable fuel obligations. (Stip. ¶ 139.) Marketers, by contrast, do not have to satisfy a renewable fuel obligation, but can acquire and trade RINs on the open market. In the years 2008 through 2010, suppliers have sold excess RINs to third parties and those suppliers that needed to purchase RINs to comply with their renewable volume obligations ("RVO") were able to do so. (Stip. ¶¶ 129, 131.) The Ethanol Blending Statute provides marketers with significant flexibility to adjust their purchasing as the market for ethanol and gasoline changes. When the economic factors, including RIN prices, favor buying ethanol and blending it, North Carolina marketers have that ability. When economic factors favor buying preblended gasoline, marketers can take advantage of that as well. (Stip. ¶ 136.)

The briefs reveal that certain facts remain disputed. Defendant and intervenor-defendant point out that plaintiffs, despite their complaints that the Ethanol Blending Statute is preempted by federal law and violates the Commerce Clause, have managed to take advantage of gaps in the statute by developing business practices that attempt to maximize their ability to sell blended gasoline and may minimize the incentive for marketers to purchase unblended gasoline. For instance, defendant and intervenor-defendant point to the stipulated facts that suppliers have

restricted sales of unblended gasoline to a single terminal in the state, and that others have offered a single grade of octane that, when blended with ethanol, only produces a more expensive, premium gasoline product. (Stip. ¶¶ 60, 61.)

Plaintiffs contend that because splash blending relies on human knowledge instead of a computerized system to blend, it presents substantially higher risks of quality and consistency and is an inferior method of ethanol blending. (See, e.g., O'Brien Decl.¶¶ 75-77; Leister Testimony ¶¶ 15-16.) In support of its Lanham Act preemption argument, plaintiffs contend that post hoc efforts to discover quality problems at the retail pump are wholly inadequate, and as such, splash blending can cause quality control problems that hurt the suppliers' trademarks.

Plaintiffs also allege that to facilitate the blending and selling of E10 at the most competitive price, suppliers have increased their pipeline shipments of blendstock to North Carolina terminals. Plaintiffs allege that where suppliers are not obligated to sell unblended product, they predominantly ship blendstock, meaning fewer and larger batches are shipped on the interstate pipeline, resulting in reduced distribution costs and increased efficiency. (Pls. Mem. Opp. 9.) Plaintiffs contend that the Ethanol Blending Statute thwarts these efficiencies by requiring suppliers to ship full octane unblended fuel in addition to blendstock, thus requiring suppliers to ship more products.

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate when there exists no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact.

7

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact requiring trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 250.

B.      Analysis

        1.      Preemption

        Under the Supremacy Clause of the Constitution, U.S. Const. art. VI, cl. 2, there are three scenarios in which a state law will be preempted by federal law. *Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604-05 (1991). First, Congress may expressly preempt state law by explicitly stating its intention to do so. *Cox v. Shalala*, 112 F.3d 151, 154 (4th Cir. 1997) (citing *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). Second, Congress can impliedly preempt state law by regulating so pervasively in a particular field that there is no room left for the states to supplement federal law. *Id.* (citing *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)). Finally, a state law is preempted to the extent it actually conflicts with federal law, either because compliance with both laws is impossible or the state law interferes with the accomplishment of Congressional objectives or the methods chosen for meeting those objectives. *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 596 (4th Cir. 2005) (citing *Gade v. Nat'l Solid Waste Mgmt. Assoc.*, 505 U.S. 88, 103 (1992); *S. Blasting Servs., Inc. v. Wilkes County, N.C.*, 288 F.3d 584, 591 (4th Cir. 2002)). "[S]tate laws can be pre-empted by federal regulation as well as by federal statutes." *Hillsborough Cty. v. Automated Medical Labs, Inc.*, 471 U.S. 707, 713 (1985).

8

Plaintiffs rely on the first and third theories to argue that three federal laws or programs preempt the Ethanol Blending Statute. First, plaintiffs allege the Ethanol Blending Statute stands as an obstacle to the objectives and methods of the federal renewable fuel program, 42 U.S.C. § 7545(o), because it interferes with suppliers' choice under the federal program of whether to blend renewable fuels themselves or purchase credits from an entity that does in order to meet federal renewable fuel requirements. Second, plaintiffs allege that the Ethanol Blending Statute conflicts with the federal Lanham Act, 15 U.S.C. § 1051 et seq., restricting suppliers' ability to exercise quality control over their trademarked products. Finally, plaintiffs allege that the federal Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 et seq., preempts the Ethanol Blending Statute because it allows a franchiser to terminate a franchise agreement if the franchisee engaged in adulteration or misbranding of the supplier's product.

The basic principles which guide the court's analysis are as follows. First, "determining whether a federal statute preempts a state statute . . . is a constitutional question." Bell Atlantic Md., Inc. v. Prince George's County, 212 F.3d 863, 865 (4th Cir. 2000) (citation omitted). That "determination is essentially a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question whether they are in conflict." Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 317 (1981) (quoting Perez v. Campbell, 402 U.S. 637, 644 (1971)) (internal quotation marks omitted).

Second, in determining the construction of the federal and state statutes at issue, this court is obliged to attempt to harmonize them if reasonably possible. See Anderson v. Babb, 632 F.2d 300, 308 (4th Cir. 1980) ("[It is] constitutional commonplace that a court should avoid, if possible, that construction of a statute that would result in its constitutional invalidation.") (citations omitted);

9

see also Unocal Corp. v. Kaabipour, 177 F.3d 755, 769 (9th Cir. 1999) (noting "the respectful approach of generally interpreting and applying legislation by harmonizing state and federal statutes where possible so as to avoid finding preemption"). In interpreting a state statute, the court should construe it in a way that avoids constitutional infirmity if possible. See Planned Parenthood of Blue Ridge v. Camblos, 155 F.3d 352, 383 (4th Cir. 1998) (en banc); see also Harris v. United States, 536 U.S. 545, 555 (2002) ("[W]hen a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court's] duty is to adopt the latter.") (quotations omitted). Similarly, when interpreting a federal statute, there is a presumption that Congress did not intend to supplant state law. College Loan Corp., 396 F.3d at 597.

If there is no interpretation but that the Ethanol Blending Statute impermissibly conflicts with federal law or is expressly preempted, it is invalidated only to the extent of that conflict. See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist., 541 U.S. 246, 258 (2004) ("[I]t appears likely that at least certain aspects of the [state law rules] are pre-empted[,] . . . [but] does not necessarily follow . . . that [they] are pre-empted in toto."); Dalton v. Little Rock Family Planning Servs., 516 U.S. 474, 476 (1996) ("[S]tate law is displaced only to the extent it actually conflicts with federal law."). Plaintiffs' claim of preemption as to the Lanham Act applies only to sales of branded gasoline. Similarly, their PMPA claim also applies only to sales of branded gasoline in a relationship governed by the PMPA. If either of these statutes preempts the Ethanol Blending Statute, it does so only as to the sale of statutorily-covered gasoline. See American Petroleum Inst. v. Cooper, 681 F.Supp.2d 635, 642 (E.D.N.C. 2010).

10

a.      Federal Renewable Fuel Program

Plaintiffs argue that the Ethanol Blending Statute creates an obstacle to the accomplishment and execution of the objectives of the federal renewable fuel program and the methods Congress has chosen to achieve them.[5]  Specifically, plaintiffs contend that Ethanol Blending Statute condones a restriction on ethanol blending which would undermine the ultimate goal of the Renewable Fuel Program,  Congress's goal of increasing renewable fuel usage, and restricts the flexible method Congress chose to give refiners to comply with renewable fuel production mandates.  Plaintiffs also contend that the law deprives obligated parties of their "federal right" to elect to pursue blending at their own facilities to acquire RINs for compliance with the renewable fuel program.  For the following reasons, the court finds that the Ethanol Blending Statute does not irreconcilably conflict with the federal program as applied.

I.      Objectives and implementation of the federal program

Although outlined in the court's prior order on summary judgment, it is necessary to reiterate the objectives of the federal renewable fuel program here.  The uncontested and uncontroversial purpose of the renewable fuel program is "to ensure jobs . . . [through] secure, affordable, and reliable energy" and "to move the United States toward greater energy independence and security" by "increas[ing] the production of clean, renewable fuels . . . ." Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594 (establishing renewable fuel program); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (amending renewable fuel program).  To that end, Congress created annual goals for renewable fuel usage, and directed the Environmental Protection

---

[5]  "The term 'renewable fuel' means fuel that is produced from renewable biomass and that is used to replace or reduce the quantity of fossil fuel present in a transportation fuel."  42 U.S.C. § 7545(o)(1)(J).  The "renewable fuel" in question is ethanol, not the resulting blend of ethanol and gasoline.

11

Agency ("EPA") to create regulations that would "ensure that gasoline sold or introduced into commerce in the United States . . . contains the applicable volume of renewable fuel determined [by that table]." 42 U.S.C. § 7545(o)(2)(A)(I), (B). Congress also created the VEETC, which grants to entities that blend gasoline with ethanol a tax credit of forty-five (45) to fifty-one (51) cents per gallon of ethanol blended. 26 U.S.C. § 6426. Though technically separate from the "renewable fuel program" defined by 42 U.S.C. § 7545(o), this tax credit works in tandem with that program by providing further economic incentive to blending.

In the renewable fuels program, Congress directed the EPA to create "compliance provisions applicable to refineries, blenders, distributors, and importers, as appropriate, to ensure that the [production] requirements . . . are met." 42 U.S.C. § 7545(o)(2)(A)(iii)(I). Each year the EPA must determine what percentage of transportation fuel sold or introduced into commerce in the United States must be renewable fuel in order to meet the annual Congressional goal. Id. § 7545(o)(3)(B). Each obligated party then is responsible for meeting that percentage in its own introduction of fuel into commerce. Id. Finally, Congress directed the EPA to create a program under which "any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is greater than the quantity required" receives credits for that excess amount which may be transferred to entities that do not meet their obligation. Id. § 7545(o)(5).

As alluded to earlier, to implement the program per Congress's instructions, the EPA mandates that each gallon of renewable fuel produced or imported be assigned a unique RIN. Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 F.R. 23,900, 23,909 (May 1, 2007). The use of RINs allows the EPA "to measure and track renewable fuel volumes starting at the point of production rather than at the point when they are blended into conventional

fuels," id. at 23,929, which the EPA found to be necessary because "a blender-based approach to tracking volumes of renewable fuel was inferior . . .," id. at 23,930. "Obligated parties are not required to physically blend the renewable fuel into gasoline or diesel fuel themselves. [Rather,] [t]he accumulation of RINs is the means through which each obligated party shows compliance with . . . the renewable fuel standard." Id. at 23,932. Because of this, trading of RINs also fulfills the credit system envisioned by Congress. See id. at 23,908.

The EPA described its development of the program, which was meant to take into account the existing market structure of the fuel industry, as follows:

> [The RIN system] was developed in light of the somewhat unique aspects of the [renewable fuel] program. [U]nder this program the refiners and importers of gasoline are the parties obligated to comply with the renewable fuel requirements. At the same time, refiners and importers do not generally produce or blend renewable fuels at their facilities and so are dependent on the actions of others for the means of compliance. Unlike EPA's other fuel programs, the actions needed for compliance largely center on the production, distribution, and use of a product by parties other than refiners and importers. In this context, we believe that the RIN transfer mechanism should focus primarily on facilitating compliance by refiners and importers and doing so in a way that imposes minimum burden on other parties and minimum disruption of current mechanisms for distribution of renewable fuels.
>
> Our final program does this by relying on the current market structure for ethanol distribution and use and avoiding the need for creation of new mechanisms for RIN distribution that are separate and apart from this current structure. Our program basically requires RINs to be transferred with renewable fuel until the point at which the renewable fuel is purchased by an obligated party or is blended into gasoline or diesel fuel by a blender. This approach allows the RIN to be incorporated into the current market structure for sale and distribution of renewable fuel, and avoids requiring refiners to develop and use wholly new market mechanisms. While the development of new market mechanisms to distribute RINs is not precluded under our program, it is also not required.

Id. at 23,937.

The EPA addressed the implementation of the RIN program as it relates to ethanol blending, stating:

13

In the case of ethanol blended into gasoline at low concentrations ($\leq$ 10 volume percent), stakeholders have informed us that a large volume of the ethanol is purchased by refiners directly from ethanol producers, and is then passed to blenders who carry out the blending with gasoline. Therefore, in many cases RINs assigned to renewable fuel will pass directly from the producers who generated them to the obligated parties who need them.

However, significant volumes of ethanol are also blended into gasoline without first being purchased by a refiner. In some cases, the blender itself purchases the ethanol. In other cases, a downstream customer purchases the ethanol and contracts with the blender to carry out the blending. Regardless, the ethanol may never be held or owned by an obligated party before it is blended into gasoline. Thus we are also requiring a blender to separate the RIN from the renewable fuel if he takes ownership of the renewable fuel and actually blends it into gasoline (or, in the case of biodiesel, into diesel fuel). This would only apply to volumes where the RIN had not already been separated by an obligated party. Since blenders will in general not be obligated parties under our program, blenders who separate RINs from renewable fuel will have no need to hold onto those RINs and thus can transfer them to an obligated party for compliance purposes or to any other party.

Id. at 23,942.

Under this system, obligated parties such as refiners are middle men who are expected neither to produce nor to blend renewable fuel themselves, though nothing in the program technically prohibits them from doing so.[6] The only requirement of them is that they acquire RINs, see 40 C.F.R. § 80.1127, which the EPA determined would in almost all cases result from either gaining ownership of renewable fuel at some point in the distribution chain or trading for RINs on the market.

---

[6] Plaintiffs note that the court's first summary judgment order noted that the EPA regulations did not contemplate that refiners would perform any blending. Plaintiffs cite EPA rulings in support, which the court acknowledges do contemplate a scenario where a supplier would do its own blending. See EPA Final Rule, *Regulation of Fules and Fuel Additives: Renewable Fuel Standard Program*, 72 Fed. Reg. 23,900, 23,929 (May 1, 2007). However, while the authority plaintiffs cite suggests that the EPA contemplated that refiners and suppliers could blend, the authority does not support the plaintiffs' implicit suggestion that the EPA required or mandated refiners and suppliers to blend. (See Pls.' Mem. Opp. 11 n.14.)

In enacting the Ethanol Blending Statute, the North Carolina General Assembly found "the use of blended fuels reduces dependence on foreign oil and is therefore in the public interest," N.C. Gen. Stat. § 75-90(c) (2008), suggesting a rationale that is not dissimilar from Congress's purpose in enacting the renewable fuel program. The language of the statute suggests that it was meant to allow marketers in North Carolina to obtain gasoline suitable for blending so that they might participate in the federal renewable fuel program, which offers significant financial benefits to market participants. Defendant and intervenor-defendant contend, as they did in their first motion for summary judgment, that, without the statute, it would be possible for suppliers to monopolize blending and thereby prohibit marketers from participating in the RIN-trading program or collecting the VEETC.

The state policy is implemented in two parts of the statute. First, suppliers that import gasoline into North Carolina are required to give distributors and retailers the option of purchasing gasoline that is not preblended with fuel alcohol and that is suitable for subsequent blending. N.C. Gen. Stat. § 75-90(b) (2008). Second, the statute voids any provision of any contract that would restrict or prevent a marketer from blending gasoline with fuel alcohol or from qualifying for any federal or state tax credit due to blenders. Id. § 75-90(c). Combining these two sections, suppliers must give marketers the option to buy and blend unblended gasoline.

iii.    As applied, the state statute does not stand as an obstacle to the federal goal of increasing usage of renewable fuels

The court first turns to plaintiffs' argument that the Ethanol Blending Statute stands as an obstacle to increasing use of renewable fuels by mandating that refiners sell unblended gasoline. Plaintiffs' argue that "[a]s the increasing annual biofuel mandate approaches 10% of total U.S. fuel

15

consumption, suppliers will soon be required to blend virtually every gallon of gasoline with renewable fuel in order to comply with federal law . . . [the Ethanol Blending Statute] stands as an obstacle to satisfying that federal obligation." (Pls.' Mem. Opp. 21.) They contrast the blending decision of suppliers and refiners, which is mandated by Congress through the renewable fuel program, with the blending decision of marketers, which they contend is driven only by economic self-interest. Plaintiffs suggest that without the Ethanol Blending Statute, suppliers would eliminate or greatly limit sales of unblended gasoline in North Carolina, which would accomplish the federal mandate. They argue that with the Ethanol Blending Statute, market forces determine how much marketers will purchase ethanol for blending, resulting in fewer renewable fuels entering the marketplace, contrary to Congress's objective.

Plaintiffs also discuss the "Blend Wall," which is a concept within the petroleum industry that contemplates that at some point in the future, unless the applicable law and/or regulations are changed or unless the country's consumption of gasoline increases, there would come a time where it would be impossible to blend enough gallons of ethanol with unblended gasoline to meet the standards set forth in the renewable fuel program. (Stip. ¶ 125.) Because the Ethanol Blending Statute would give marketers the autonomy to choose whether to blend, plaintiffs argue that giving marketers this choice limits suppliers from blending sufficient amounts of ethanol to meet the rising fuel mandates (contemplated by the Blend Wall), and that this is evidence that compliance with both federal and state law is a virtual impossibility. (Pls.' Mem. Opp. 22.)

Plaintiffs again define Congress's objective too narrowly as increasing blending of renewable fuels by suppliers and refiners. In their response, they supplement this argument with the fact that when marketers have the option to blend, the decision of whether or not to blend might be driven

by market forces. But the fact still remains that Congress's goal was increasing production and usage of renewable fuels generally. Even more specifically, Congress's goal was to ensure that a statutorily set amount of renewable fuel be produced each year. While suppliers are obligated to carry much of the burden for increasing renewable fuel usage to the level set by Congress, there is nothing in the federal program that suggests Congress wished to hinder other market participants from doing so as well. The RIN system described in detail above suggests as much.

Plaintiffs rely on evidence from various marketers who admit that when the price of ethanol relative to gasoline changed, the marketers stopped blending and returned to selling unblended, ethanol-free gasoline to consumers. (See, e.g., Holmes Testimony ¶ 27.) This evidence, they suggest, is probative that the Ethanol Blending Statute gives marketers a choice that prohibits suppliers from complying with the renewable fuel mandates of federal law. But the evidence in the record shows that this has not happened. The parties agree that as of 2010, it was possible to blend enough gallons of ethanol to meet the renewable fuel standards, and the Blend Wall has not been reached. (Stip. ¶ 126.) Furthermore, plaintiffs agree that if the Ethanol Blending Statute were repealed tomorrow, the Blend Wall would still prevent suppliers from meeting their obligations. (Stip. ¶ 127.) Most importantly, to date, suppliers have been able to meet their respective RVO each year that the obligations have been in place. (Stip. ¶ 128.) Thus the vulnerability to market forces that plaintiffs repeatedly point out is the consequence of the Ethanol Blending Statute's choice for marketers, has not resulted in suppliers failing to meet their obligations under federal law. As applied, the Ethanol Blending Statute does not inhibit Congress's objectives under the renewable fuels program.

Additionally, as noted in the court's previous summary judgment order, plaintiffs' arguments regarding market incentives do not take into account the broader market incentives for all participants in the renewable fuels process. Though suppliers refiners blending ethanol into every gallon of gasoline they produce may be a more effective way of increasing renewable fuel production, Congress did not require suppliers to do this. While the financial incentives may be stronger for suppliers because they are subject to fines if they do not meet their RVO, the program also contains substantial financial incentives for marketers. The Ethanol Blending Statute was enacted in part because these economic incentives are so strong, and there is nothing in the record to indicate that marketers will act any differently from refiners in taking full advantage of these incentives. In fact, the RIN program established by the EPA assumes that the program will be driven in part by already existing market forces, and essentially requires marketers to be participants in the system.

Second, the Ethanol Blending Statute does not inhibit that part of Congress's plan that applies exclusively to suppliers, because it does not prohibit refiners from acquiring RINs to meet their obligations. Suppliers and refiners are only one of many participants in the distribution chain, and the EPA's expectations in implementing the program that suppliers would not be the only ones blending continues to counsel against a finding of preemption simply because suppliers will not be able to monopolize blending in North Carolina. When the court considered the first motions for summary judgment, there was nothing then in the record to indicate that suppliers would not be able to continue to blend gasoline to sell in North Carolina, nor anything to indicate that individual suppliers and refiners would no longer be able to meet their quotas or that market participants in the aggregate will fail to meet the goal set by Congress. There is no showing that any of these

hypothetical scenarios have occurred. As noted above, to date, suppliers have been able to meet their respective RVO each year that such obligations have existed, and in each of the years 2008 through 2010, suppliers have sold excess RINs to third parties.[7] (Stip. ¶¶ 128-29.)

Plaintiffs argue that the effects of the Ethanol Blending Statute stand as even more of an obstacle to federal law when considered in conjunction with the effect of similar laws in other states. The law plaintiffs cite is readily distinguishable. In <u>Bonito Boats, Inc. v. Thunder Craft Boats, Inc.</u>, the Supreme Court struck down a state unfair competition law because it attempted to provide a party the same rights and protections of federal patent law but under substantially lower standards that those required to achieve a federal patent. 489 U.S. 141, 160-61 (1989). Here, the Ethanol Blending Statute does not offer a way for marketers to bypass federal law to receive benefits that are virtually identical to those conferred by federal law. Instead, it furthers federal objectives by increasing the number of participants in the renewable fuels programs, regardless of whether those participants are subject to RVOs or not, a scenario contemplated by Congress. "Obligated parties are not required to physically blend the renewable fuel into gasoline or diesel fuel themselves. [Rather,] [t]he accumulation of RINs is the means through which each obligated party shows compliance with . . . the renewable fuel standard." Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 F.R. 23,900, 23,932 (May 1, 2007).[8] There is no showing

---

[7] Plaintiffs note that allowing marketers to blend, and thus enter the market for RINs, may result in fewer RINs for suppliers, who must have a certain number under the renewable fuel program. However, as noted above, there is no evidence that suppliers have not had enough RINs Plaintiffs' evidence that some marketers failed to sell their now-expired RINs is similarly ineffectual because the suppliers have not shown evidence that they have not obtained enough RINs.

[8] The other cases plaintiffs cite related to this issue are similarly unavailing. While it is true that in considering a preemption challenge, a court should analyze the effects of the law in light of the cumulative effect of other states enacting similar laws, the fact remains that plaintiffs have not demonstrated facts to show that the Ethanol Blending Statute conflicts with federal law.

19

that similar laws in other states have resulted in a cumulative effect of the dangers they have forecast with regard to frustration of federal objectives.

> iv.    The state statute does not stand as an obstacle to the flexible method chosen by Congress to implement the federal program

The court next addresses plaintiffs' argument that the Ethanol Blending Statute stands as an obstacle to the flexibility of the Congressional program of renewable fuel mandates. Plaintiffs define this flexibility as the right given to a refiner either to blend a certain amount of gasoline itself or to obtain credits from other entities that have blended. Plaintiffs allege that by requiring r suppliers to sell at least some unblended gasoline, the Ethanol Blending Statute effectively takes away this right as to any particular amount of unblended gasoline required to be sold to local parties who have no similar obligation to choose between blending and purchasing credits. Plaintiffs again rely on Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), a case in which the Supreme Court addressed preemption of state laws that interfered with flexible federal programs. Plaintiffs also rely on Clean Air Markets Group v. Pataki, 338 F.3d 82, 84 (2d Cir. 2003), a case from the Second Circuit that addressed preemption of a state law that interfered with the emission allocation and transfer system as set forth in Title IV of the Clean Air Act.

This court had opportunity to distinguish Geier in its first summary judgment order, and it does so again here. In Geier, a District of Columbia woman sued her car's manufacturer when she was injured after she collided with a tree. 529 U.S. at 865. She claimed the manufacturer had designed its car negligently and defectively because it lacked a driver's side airbag. Id. Federal law, however, required only a certain percentage of cars to be equipped with passive restraint systems, and even then allowed manufacturers to choose between different passive restraint systems rather than mandating airbags. Id. at 875-81. In finding the state tort claim preempted, the Court

20

concluded that "by its terms [it] would have required manufacturers of all similar cars to install airbags rather than other passive restraint systems, such as automatic belts or passive interiors." Id. at 881. In doing so, the state tort claim "would have presented an obstacle to the variety and mix of devices that the federal regulation sought." Id. Furthermore, it would have "required all manufacturers to have installed airbags in respect to the entire District-of-Columbia-related portion of their . . . new car fleet, even though [federal law] at that time required only that 10% of a manufacturer's nationwide fleet be equipped with any passive restraint device at all." Id.

Somewhat similarly, in Clean Air, the New York legislature sought to address the problem of $SO_2$ emissions that traveled from certain states to the Adirondack region of New York. 338 F.3d at 84. Title IV of the Clean Air Act had the express purpose to reduce the adverse effects of acid deposition caused by harmful emissions of the type New York sought to reduce. Id. Title IV established a "cap and trade" system whereby utilities were allocated a certain number of emission allowances per year. Id. Pursuant to the statute, the allowances could be transferred to any other person who held such allowances, and this sale of unneeded allowances created financial incentive for utilities to reduce their $SO_2$ emissions. Id. Concerned with $SO_2$ emissions, New York passed a law that effectively required state utilities to attach restrictive covenants to any $SO_2$ allowance it sold that would prohibit the subsequent transfer of the allowance to certain states. Id. The Second Circuit found that the New York statute was preempted by Title IV, primarily because the state statute interfered with the "*methods* by which the federal statute was designed to reach [its] goal." Id. at 87. Because Title IV permitted allowances to be traded to any other person, the New York statute that would limit who could get the allowances interfered with Congress's method.

Plaintiffs' reliance on these two cases is misplaced. In <u>Geier</u>, the flexibility stemmed from a specific "policy judgment that safety would be best promoted if manufacturers installed <u>alternative</u> protection systems in their fleets rather than one particular system in every car." 529 U.S. at 881 (emphasis in original). The obligation to install passive restraint systems in ten percent (10%) of cars fell on car manufacturers alone, and a state tort claim for failure to install an airbag therefore directly impeded on choices – what restraint system to install and what models on which to install it – that were left solely to car manufacturers. As the court noted in its first summary judgment order, with the renewable fuel program, by contrast, there is no explicit policy judgment that the increasing usage of renewable fuels depends on a program that gives incentives to suppliers to craft a new blending framework. Quite the opposite, in fact. Furthermore, the "choice" of whether to blend is not left to suppliers alone. Instead, the program expressly relies on multiple actors for implementation, regardless of where the burden for noncompliance ultimately falls, and there is no showing that the Ethanol Blending Statute interferes with the interaction of these parties as envisioned by the EPA.

Similarly, <u>Clean Air</u> does not provide the support plaintiffs seek because it involved a state statute that sought to place restrictions on a credit trading system that federal law mandated must be unrestricted. 338 F.3d at 88-89. Here, in contrast, the Ethanol Blending Statute places no restrictions on who can sell, buy, or trade RINs. In fact, as discussed previously, the Ethanol Blending Statute allows marketers to participate in the market for RINs, even though they do not have obligations under the renewable fuels program, a scenario specifically envisioned by Congress. <u>See</u> Renewable Fuel Standard Program, 72 F.R. at 29,932. Furthermore, participation by marketers

has not hindered obligated parties from obtaining the necessary amount of RINs, or from trading or selling RINs themselves. (Stip. ¶¶ 129-131.)

Underlying plaintiffs' preemption argument is an assertion that it is unfair for their members to bear the risk of penalties for failing to produce renewable fuels or to be required to buy credits for those who overproduce while being unable to monopolize the benefits created by the Congressional incentive program for such production. The court references its reasoning in the first summary judgment order. The relevant question for preemption analysis is not which private parties benefit from the respective statutes, but rather whether the objectives or methods of the Congressional statute are interfered with by the state statute. Furthermore, the "flexibility" that the renewable fuel program envisions is manifestly <u>not</u> the flexibility for refiners to develop a system where they blend all of their gasoline with ethanol and sell only blended gasoline to distributors, and where distributors cannot participate in selling and trading of RINs. <u>See</u> Renewable Fuel Standard Program, 72 F.R. 23,900, 23,942 (May 1, 2007). As evidenced by the RIN program, the federal renewable fuel program does not contemplate the monopoly that plaintiffs are seeking, and plaintiffs have not demonstrated a disputed material fact that suggests the Ethanol Blending Statute will interfere with Congress's objective to increase production of renewable fuels.

For these reasons, the court GRANTS defendant's and intervenor-defendant's motions for summary judgment as to plaintiffs' claim that the Ethanol Blending Statute is preempted by the Federal Renewable Fuels Program.

### b. Lanham Act

Next, plaintiffs argue that the Ethanol Blending Statute is preempted because it interferes with suppliers' federal trademark rights. Specifically, plaintiffs contend that a supplier is unable to

control the quality of the products bearing its trademark because the Ethanol Blending Statute authorizes marketers to produce ethanol-blended gasoline bearing that trademark without the supplier's consent or oversight. Additionally, plaintiffs argue that the Ethanol Blending Statute requires the uncompensated sale of a branded product. The court addresses each argument in turn, and, for the reasons that follow, finds that the Lanham Act does not preempt the Ethanol Blending Statute.

The Lanham Act gives trademark owners the right to control the quality of goods associated with their marks. See Polymer Tech. Corp. v. Mimram, 37 F.3d 74, 78 (2d Cir. 1994) ("[The sale of] [g]oods . . . that do not meet the trademark owner's quality control standards . . . constitute[s] trademark infringement.") (citations omitted). The Fourth Circuit first addressed the "quality control" aspect of trademark law in Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir. 1991), a case cited by both parties. In that case, a wholesaler of bulk oil bought Shell Oil Co. ("Shell") oil from authorized distributors and resold it under the Shell trademark. Id. at 106. The wholesaler argued that it was permitted to do so because trademark law does not apply to the sale of genuine goods bearing a true mark. Id. at 107. The court disagreed, holding "[a] product is not 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer." Id. (citations omitted); see also United States v. Farmer, 370 F.3d 435, 440-41 (4th Cir. 2004) (holding that an individual could be held criminally liable for infringing on trademark owner's right to control by affixing mark to shirts manufactured for, but rejected by, the mark's owner).

The wholesaler also argued that there was no actual confusion because its customers knew that it was not an authorized distributor of Shell oil. Shell Oil, 928 F.2d at 107-08. The court

rejected this notion, holding that the touchstone of trademark infringement is the likelihood of confusion, not whether confusion actually occurs. Id. at 108. Based on the factual record developed by the district court, the Fourth Circuit agreed that the "use of Shell's marks was deceptive and likely to confuse consumers who rely on the trademarks as symbols of Shell quality." Id.

In Mobil Oil Corp. v. Va. Gas. Marketers & Auto. Repair Ass'n, 34 F.3d 220 (4th Cir. 1994), Mobil Oil Corp. ("Mobil") argued that a Virginia law was "inconsistent with its right of quality control [under the Lanham Act], because [the state law] prevent[ed] Mobil's effective regulation of the quality of goods and services sold in Mobil gas stations." Id. at 226. The court disagreed, holding that prohibitions on minimum hours, maximum stations, and quotas did not prevent Mobil from maintaining the quality of its products and services. Id. at 226-27. The court noted that twenty-four hour service was not an integral component of Mobil's trademark, that the number of stations a franchisee has did not have a "significant negative impact on Mobil's quality control efforts," and that the franchise agreement in question required the franchisee to "exercise the highest degree of care and diligence in the handling, storage and sale of all products delivered to the marketing premises, and protect the quality of those products." Id.

These cases establish that a federal trademark holder has the right to dictate and oversee quality control measures for the production and sale of its products and that a state law will be preempted if it interferes with a trademark owner's ability to engage in that quality control or creates a substantial likelihood of confusion. See also Mariniello v. Shell Oil Co., 511 F.2d 853, 858 (3d Cir. 1975) ("If state law would permit confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal trademark holders, then the state law would, under the Supremacy Clause, be invalid."). Therefore, the questions for the court to decide are whether the

25

Ethanol Blending Statute interferes with plaintiffs' members' ability to engage in quality control or is otherwise substantially likely to lead to consumer confusion as to trademarked blended gasoline, and lastly, whether application of the Ethanol Blending Statute results in the uncompensated sale of a branded product.

i.      Ethanol Blending Statute Does Not Prevent Trademark Owners From Controlling How Branded Fuel is Handled

Plaintiffs' argument is premised on language in the Ethanol Blending Statute that "any provision of any contract that would restrict or prevent a distributor or retailer from blending gasoline with fuel alcohol or from qualifying for any federal or State tax credit due to blenders is contrary to public policy and is void." N.C. Gen. Stat. § 75-90(c). Plaintiffs argue that this language prevents trademark owners (suppliers) from prescribing and enforcing important quality control measures for their branded fuel, specifically, that language in the Ethanol Blending Statute prevents suppliers from prohibiting what they contend is the riskier process of splash blending. Plaintiffs repeatedly cite to the record, specifically the testimony of various individuals who state that inline blending is superior to splash blending and that post-hoc quality control measures are inadequate when compared to ex ante quality control at the terminal where inline blending occurs. (See, e.g., O'Brien Decl. ¶¶ 75-77.)

Defendant and intervenor-defendant assert that nothing in the statute prevents franchisers from requiring compliance with their quality control procedures, and that the statute does not interfere with a supplier's ability to assert a Lanham Act claim against an individual franchisee for failing to comply with such procedures. Additionally, defendant and intervenor-defendant point out that the statute does not prevent quality control measures (such as testing by the trademark owner)

<u>after</u> the fuel has been blended. Defendant and intervenor-defendant contend that this post-blending quality control is sufficient for Lanham Act purposes.

Plaintiffs' arguments as to quality control confuse the fact that in the instant case plaintiffs have not brought suit for trademark infringement, but rather for a finding of preemption. Additionally, in the face of multiple possible meanings, the court again finds helpful the Fourth Circuit's admonition in <u>Planned Parenthood</u>, 155 F.3d at 383, to construe a state statute not yet construed by the state court in a way to avoid its unconstitutionality. <u>See</u> <u>Am. Petroleum Inst.</u>, 681 F.Supp.2d at 650.

With this admonition in mind, the court affirms its earlier finding that the defendant's and intervenor-defendant's interpretation of the Ethanol Blending Statute, which removes any alleged constitutional infirmities, is reasonable, and is further affirmed by the evidence in the record which shows that the statute, as applied, does not prevent suppliers from engaging in quality control of their trademarked, branded products. Neither party disputes the court's analysis in the first summary judgment motion regarding the language of the Ethanol Blending Statute, which found that the statute appears concerned with restrictions on <u>quantity</u> of blending (and the resulting amount of the related federal tax credit) rather than on <u>quality</u> of blending. <u>See</u> <u>Am. Petroleum Inst.</u>, 681 F.Supp.2d at 650.

Under this construction of the statute, and upon review of the record, the court finds that plaintiffs' members may continue to engage in quality control over the blending of their trademarked gasoline, despite their assertions to the contrary. They may set forth specific guidelines for blending and require random testing of the resulting blended gasoline, though they are not necessarily limited to these measures. For sales of gasoline outside a franchise agreement or to buyers unwilling to

submit to or diligently follow their quality control procedures, suppliers may forbid use of the trademarked name as to the subsequent sale of the blended gasoline and bring suit under the Lanham Act where such unauthorized use occurs.[9]  Because they maintain the ability to engage in quality control and bring suit to enforce their trademarks, plaintiffs cannot contend that consumer confusion is likely to occur.

While plaintiffs repeatedly argue that splash blending prevents them from effective quality control, the undisputed facts do not support this contention.  The parties have stipulated that suppliers have asked marketers in North Carolina to sign splash blending agreements if marketers wish to splash blend a supplier's branded gasoline product with ethanol, and in some cases the agreements impose quality control measures for splash blending and include statements that limit the suppliers' liability for blending errors.  (Stip. ¶ 74.)  Likewise, suppliers have procedures in place to test the quality of the gasoline sold under their marks.  (Id. ¶ 75.)  Notably, some suppliers voluntarily permitted splash blending by marketers before the Ethanol Blending Statute was passed; since the 1980s, marketers in North Carolina and elsewhere were splash blending and some suppliers expressly permitted this practice.  (Id. ¶¶ 76, 82.)

Additionally, it is undisputed that problems can arise from both inline and splash blending. (Stips. ¶¶ 86-121.)  Plaintiffs place much reliance on possible harms from splash blending, but the facts of record show these problems can occur when fuel is blended, not just when it is splash

_____

[9]  Plaintiffs argue that their right to bring suit under the Lanham Act is "beside the point."  (Pls.' Mem. Opp. 17 n.20.) In support of this, plaintiffs cite Mobil Oil Corp, suggesting that a literal reading of the language in that case creates a standard of preemption that a state law that restricts any possible quality control measure a trademark owner might desire to implement is preempted by the Lanham Act.  The court does not read Mobil Oil Corp to hold such.  In fact, the Fourth Circuit found that various "quality control measures" Mobil argued were denied it by the state law in question were not in fact necessary for Mobil to protect its mark, and that the state law was not preempted.  Mobil Oil Corp, 34 F.3d at 226-27.

blended.[10]  Contrary to plaintiffs' assertions, this evidence does not create a dispute of material fact, but rather reveals that there is no question that blending fuel is an imperfect process.  Additionally, it is undisputed that the parties do not agree on the efficacy of various blending processes.  Contrary to plaintiffs' argument otherwise, a dispute over the best blending practice does not create an issue of material fact to withstand summary judgment.  The issue for summary judgment is whether there is a dispute of material fact as to whether the Ethanol Blending Statute prevents suppliers from engaging in quality control of their products which would result in preemption.  As discussed above, the undisputed facts show that suppliers are not impeded from engaging in quality control and that there is no likelihood of consumer confusion.  As such, there is no genuine issue that there is a reasonable construction of the ethanol blending statute that avoids constitutional problems.

ii.      Quality of Splash Blended Fuel

Plaintiffs argue that the quality of splash blended fuel is irrelevant because trademark law allows a trademark owner to determine what its quality control measures will be.  The court has carefully reviewed the cases plaintiffs cite and finds none of them to be on point.  As a preliminary matter, the cases involve suits brought under the Lanham Act for trademark infringement, and none of them deal with the issue of federal preemption of a state law.  For instance, Power Test Petroleum Distributors, Inc., v. Calcu Gas, Inc., 754 F.2d 91, 94 (2d Cir. 1985), involved a franchisee improperly selling a brand of gasoline from a different supplier under a supplier's trademark.[11]  The

---

[10]  Plaintiffs' list of "potential consumer harms" from splash blending includes various harms that can occur if blended gasoline does not contain the correct amount of ethanol.  (See Pls. Resp. Opp. 17; Preston Testimony ¶ 26.)  The stipulations of the parties clearly reveal that both splash blending and inline blending can result in inappropriate amounts of ethanol in blended fuel.  (Stips. ¶¶ 86-121.)

[11]  The court again notes that nothing in the Ethanol Blending Statute prevents a mark owner from bringing suit for trademark infringement.

29

franchiser tested its gasoline by its own standards before distributing gasoline to the franchisee for sale, and when the franchisee sold gasoline from a different supplier, the franchiser was deprived of its ability to impose its quality control measures. Id. at 98.[12] The factual scenario in the present case is distinguishable, as this case involves no allegation that a marketer is selling a supplier's product under a different supplier's trademark, nor do plaintiffs show that under the Ethanol Blending Statute this is allowed to occur. In Power Test and the cases like it, the franchiser and/or trademark owners were prevented from imposing their quality control standards. As described at length above, suppliers in this case have stipulated that they are imposing certain quality control measures on splash blended gasoline. (Stip. ¶ 74, 75.)[13]

      iii.     Uncompensated Sale of a Branded Product

Plaintiffs' last argument for preemption under the Lanham Act is that a reasonable fact-finder could conclude that the Ethanol Blending Statute interferes with the Lanham Act's goal of protecting trademark owners' investments from piracy. Specifically, plaintiffs cite Shell Trademark Management BV & Motiva Enterprises, LLC v. Ray Thomas Petroleum Co., to argue that selling gasoline under a trademark when the gasoline was not purchased from the holder of the trademark is appropriating the goodwill of the trademark holder and is a violation of the Lanham Act. 642

---

[12] Amoco Oil Co. v. D.Z. Enterprises, Inc., 607 F.Supp. 595, 598 (D.C.N.Y. 1985) and Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 478 F.Supp. 243 (1979) involve similar factual scenarios where distributors or wholesalers were either commingling a supplier's gasoline or selling others' products under a supplier's trademark. As described above, these cases are distinguishable from the present case.

[13] The other cases plaintiffs cite are similarly distinguishable and thus unavailing. Shell Trademark Mgmt. BV & Motiva Enterprises, LLC v. Ray Thomas Petroleum Co., 642 F.Supp.2d 493, 501-02 (W.D.N.C. 2009) is another case involving a gasoline wholesaler commingling gas from a refiner with other gas and selling under the refiner's trademarked name. Shell Oil Co., 928 F.2d 104, 107 (4th Cir. 1991), involved a wholesaler substituting its quality control standard for the supplier's, something that also is not alleged to have occurred in the present case. Polymer Tech. Corp., 37 F.3d at 78-80, is similarly not on point and appears to be unhelpful to plaintiffs. In that case, the Second Circuit affirmed the district court's denial of preliminary injunction based on trademark infringement because the trademark owner failed to show that distributor violated the owner's quality control standards. Id.

F.Supp.2d 493, 501-02 (W.D.N.C. 2009). <u>Shell Trademark Management</u>, as noted earlier, involved a wholesaler commingling gasoline from one supplier with other suppliers' gasoline, but selling the gasoline under the supplier's trademark. 642 F.Supp.2d at 501-02. The case is factually distinguishable from the present case, yet plaintiffs suggest that it applies to the sale of gasoline blended with ethanol. Specifically, plaintiffs' argument is that if 10% of every gallon of blended fuel consists of ethanol, when the blended fuel is sold under a supplier's trademark, that supplier has only been paid for 90% of the gallon, however, when marketers sell fuel that was preblended by a supplier under that supplier's trademark, the supplier is being compensated for 100% of the product.

This argument fails based on the stipulations of the parties. First, the parties agree that the type of ethanol used in inline blending and splash blending is the same. (Stip. ¶ 85.) Thus, blended fuel contains a supplier's unblended gasoline plus roughly 10% ethanol, regardless of whether the blending occurs through inline processes or through splash blending. Thus reliance on <u>Shell Trademark Management</u> is inappropriate, since that case involved one supplier's product being sold at pumps bearing another supplier's trademark, while the present case involves one supplier's product being sold at a pump bearing that supplier's trademark, just with ethanol blended into it, and the ethanol is the same, regardless of the blending process. Furthermore, as noted extensively throughout this order, blended gasoline, regardless of how it was blended, is still subject to suppliers' quality control standards, and thus there is no conflict with the Lanham Act that results in preemption.

Additionally, as defendant and intervenor-defendant note in their reply, it is undisputed that suppliers set the price for gasoline sold to marketers. (Stip. ¶ 16, 50, 51, 66; GAO Report, Pls.' Ex. 22 at 36.) The record also shows that suppliers can contract to require marketers to state whether

or not they intend to blend trademarked gasoline with ethanol, and can use this information to determine price and forecast supply, among other things. (O'Brien Dep. 70:9-19; Stip. ¶ 67). As such, plaintiffs' arguments that sale of splash blended gasoline results in a sort of theft of their trademarked product is not supported by the record.

For the foregoing reasons, the court finds that as applied, the Ethanol Blending Statute is not preempted by the Lanham Act. Defendant's and intervenor-defendant's motions for summary judgment are GRANTED as to the Lanham Act preemption claim.[14]

> c.      Petroleum Marketing Practices Act ("PMPA")

In their previous motion for summary judgment, plaintiffs argued that the preemption language in the PMPA expressly preempted the Ethanol Blending Statute. Plaintiffs now take a different tack. They argue that the Ethanol Blending Statute prevents a franchiser from terminating a franchise agreement for "willful adulteration" of their product. The PMPA permits termination of a franchise relationship by a franchiser for "willful adulteration, mislabeling, or misbranding of motor fuels or other trademark violations by the franchisee." 15 U.S.C. § 2802(c)(10). Plaintiffs argue that the Ethanol Blending Statute is preempted by PMPA because it clearly conflicts with the permissible grounds for termination in § 2802(c)(10). At the very least, plaintiffs argue that what constitutes "adulteration" as the term is used in all of the franchise agreements between suppliers and marketers is a question of fact inappropriate for determination at the summary judgment stage. Defendant and intervenor-defendant, however, argue that the only issue before the court is the plaintiffs' claim that the Ethanol Blending Statute prevents suppliers from terminating franchisees

---

[14] As noted the first summary judgment order, nothing in this order, however, should be taken to prohibit plaintiffs' members from bringing individual infringement claims against franchisees who refuse to abide by contractual quality control provisions in the future.

for "willful adulteration" of a product, and that this issue is a purely legal one.  (Def.' Summ. J. Mem. 17.)

Plaintiffs argue that splash blending would constitute "willful adulteration, mislabeling or misbranding of motor fuels or other trademark violations by the franchisee" and thus constitutes a practice upon which a franchiser could terminate a franchise agreement under the PMPA.  See 15 U.S.C. § 2802(b)(2)(C).  Because the Ethanol Blending Statute does not allow a supplier to terminate an agreement because of a marketer's decision to splash blend, plaintiffs contend that the statute is clearly preempted by the PMPA.  For the reasons that follow, the court disagrees and concludes that the PMPA does not preempt the Ethanol Blending Statute as applied.

As a preliminary matter, the court agrees with defendant and intervenor-defendant that the issue here is the meaning of a statutory term, "adulteration" as it is used in the PMPA, and this is clearly a question of law.  See Martin v. Pilot Indus., 632 F.2d 271, 275 (4th Cir. 1980).  As the court noted in its prior order, the Fourth Circuit itself noted in Mobil Oil, "[t]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." 34 F.3d at 220 (citations and quotations omitted) (alteration in original).  As discussed in more detail below, the Ethanol Blending Statute does not conflict with the PMPA's provision allowing a franchiser to terminate a franchise with a franchisee who adulterates the franchiser's product based on the plain meaning of "adulterate."

Following the Fourth Circuit's guidance in Mobil Oil regarding plain meaning, the court first notes that it is undisputed by the parties that the intention of Congress in enacting the PMPA was to "protect petroleum franchisees from arbitrary or discriminatory termination and nonrenewals."

<u>Mobil Oil</u>, 34 F.3d at 223 (citing S. Rep. No. 731, 95th Con., 2d Sess. 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 874). Thus, if the literal application of the plain meaning of the PMPA conflicts with this purpose, the court will find the plain meaning inconclusive.

Webster's Third New International Dictionary defines "adulteration" as the process of adulterating. The root word, "adulterate" is defined as "the partial substitution of one substance for another without acknowledgment." <u>See</u> Webster's Third New International Dictionary 30 (2002). The plain language of the PMPA thus allows a franchiser to terminate a franchise if a franchisee willfully substitutes a franchiser's product with another product without acknowledgment. Another way of looking at it would be selling a product that is not a supplier's under that supplier's trademark without a franchisee acknowledging it was doing so, a scenario similar to what occurred in the variety of trademark infringement cases cited by plaintiffs. (<u>See</u> Pls.' Mem. Opp. 18-19.) This interpretation of the plain meaning of "adulterate" makes sense in the context of the specific provision of the PMPA, which lists adulteration with "mislabeling or misbranding of motor fuels *or other trademark violations*." § 2802(c)(10). The plain language of the statute suggests that adulteration is similar to or a form of misbranding or mislabeling, or a related form of trademark violation. This interpretation of adulterate is consistent with Congress's intent to protect the franchise relationship in the PMPA, as protecting franchisers from being bound by franchises in which a franchisee is mislabeling or misbranding a franchiser's product or otherwise infringing the franchiser's trademark would not promote the goal of protecting franchise relationships.

While the court is unaware of, and the parties fail to cite to, a case that provides a clear definition of the term adulterate as it is used in the PMPA, the limited case law interpreting § 2802(c)(10) of the PMPA affirms the court's interpretation of the term. <u>See</u> <u>Wisser Co., Inc. v.</u>

Mobil Oil Corp., 730 F.2d 54 (2d Cir. 1984) (equating "misbranding" of gasoline with adulteration provision of PMPA); Little Tor Auto Ctr. v. Exxon Co. USA, 830 F.Supp. 792 (S.D.N.Y. 1993) (same); Shell Oil Co. v. Wentworth, 822 F.Supp. 878 (D.Conn. 1993) (same); Shell Oil Co. v. Avar Corp, 1998 WL 312119, 3 (N.D.Ill.,1998) ("commingling" of fuel a violation of adulteration provision of PMPA); Aoude v. Mobil Oil Corp., 1994 WL 548061 *1-3 (D. Mass. 1994) (mixing two suppliers' gasoline products constitutes adulteration). The case law reveals that the adulteration envisioned by the PMPA is mixing or commingling a trademarked supplier's fuel with other fuel. None of the cited cases involve blending gasoline, or the blending of gasoline with ethanol.

Furthermore, the court may consider industry practice when determining Congressional intent. See In re Price, 562 F.3d 618, 628-629 (4th Cir. 2009) (rejecting a proposed construction of a statute because such construction would vitiate Congressional intent by disregarding industry practice at the time Congress passed the statute). As defendant and intervenor-defendant point out, blending fuel with renewable fuel is an accepted industry practice that Congress has recognized and mandated through federal law. See 42. U.S.C. § 7545(o) (containing multiple references to "blending" in the federal statute setting forth the renewable fuels program); see also Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 F.R. 23,900, 23,909 (May 1, 2007) (the EPA instructions for implementing the renewable fuels program, which contain numerous references to blending). When Congress mandated the blending of fuels through the renewable fuel program, it did not require inline or splash blending, just that fuel be blended, and the parties have stipulated that splash blending has been practiced since the 1980s. (Stip. ¶ 82.) As defendant and intervenor-defendant point out, Congress does not legislate in a vacuum, In re Thinking Machines Corp., 67 F.3d 1021, 1025 (1st. Cir. 1995), and it would belie Congressional intent to suggest that

the plain meaning of adulteration in the PMPA includes blending gasoline with renewable fuels. This would lead to the illogical result that marketers complying with the federal renewable fuels program would be simultaneously engaging in a prohibited activity that constitutes grounds for termination of their franchise under the PMPA. The PMPA and the federal renewable fuels program coexist because blending is not equivalent to adulteration as plaintiffs suggest.

The question now becomes whether the Ethanol Blending Statute conflicts with the PMPA's adulteration provision, specifically whether the Ethanol Blending Statute would prohibit a franchiser from terminating a franchise if the franchisee engaged in willfull adulteration, or commingling with a franchiser's product, or engaging in other forms of trademark infringement with that product, including misbranding. A plain reading of the Ethanol Blending Statute reveals that it does not include such a prohibition. Nor do the facts in the record suggest that as applied, the Ethanol Blending statute would permit a franchisee to adulterate or commingle a supplier's oil with oil from another supplier, or misbrand a supplier's oil, and then not allow a franchisor to bring suit. Plaintiffs have failed to show any evidence in the record that suppliers have not been able to terminate franchises if a franchisee wilfully mislabels, misbrands, or mixes that supplier's product with a different type or brand of gasoline and then sells under that supplier's trademark. Under the plain meaning of adulterate, such practice would clearly be prohibited under the PMPA, and the Ethanol Blending Statute does not diminish the supplier's right to terminate a franchise for such behavior.

The court is reminded of the rule that in interpreting a state statute, the court should construe it in a way that avoids constitutional infirmity if possible. See Planned Parenthood, 155 F.3d at 383. The plain meaning of the PMPA does not conflict with the plain meaning of the Ethanol Blending

Statute. In coming to this conclusion, the court relies not only on the plain meaning of the terms themselves but the interpretations of those terms in the case law and in the industry.

Accordingly, the Ethanol Blending Statute does not conflict with the adulteration provision of the PMPA, specifically the provisions in the PMPA that allow a franchiser to bring suit if a franchisee engages in adulteration of the franchiser's product. It is unnecessary for the court to engage in any analysis regarding the meaning of "adulteration" in specific contracts, because the question before the court is simply one of law, the meaning of a term in the federal statute.

As such, defendant's and intervenor-defendant's motions for summary judgment are GRANTED as to plaintiffs' claim for preemption based on the PMPA.

3.    Dormant Commerce Clause

Plaintiffs contend that the Ethanol Blending Statute is unconstitutional because it violates the Commerce Clause of the Constitution, U.S. Const. art. I, § 8, cl. 3. In its prior summary judgment order, the court rejected plaintiffs' argument that the Ethanol Blending Statute facially discriminates against interstate commerce by imposing an obligation to sell unblended gasoline only on suppliers that import gasoline into North Carolina, but not on marketers that purchase gasoline within the state. Plaintiffs now focus their argument on the effect of the Ethanol Blending Statute on interstate commerce in relation to the statute's putative local benefits. (See Pls.' Mem. Opp. 32 n.34.)

The court must usually engage in a second "tier" of analysis where the state statute is not facially discriminatory. If the law regulates evenhandedly and only indirectly affects interstate commerce, the law is upheld unless there is an undue burden imposed on interstate commerce that is "clearly excessive in relation to the putative local benefits." Brown v. Hovatter, 561 F.3d 357,

363 (4th Cir. 2009) (citing Pike v. Bruce Church Inc., 397 U.S. 137, 142 (1970)). This test is known as the "Pike" test. A "less strict scrutiny" applies under the undue burden tier. Yamaha Motor Corp., U.S.A. v. Jim's Motorcycle, Inc., 401 F.3d 560, 567 (4th Cir. 2005). A statute need not be "perfectly tailored" to survive Pike balancing, but it must be reasonably tailored. Id. The "extent of the burden that will be tolerated . . . depend[s] on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Id. at 569 (citing Pike, 397 U.S. at 142). In determining whether a statute has a legitimate local purpose and putative local benefits, the court must proceed "with deference to the state legislature." Id. "Courts are not inclined to second-guess the empirical judgments of lawmakers concerning the utility of legislation." Id. (citations omitted). Thus, this court considers whether the North Carolina legislature had a rational basis for enacting the Ethanol Blending Statute, and it applies a deferential standard in identifying the putative benefits to the state.

The Pike test requires closer examination when the burdens fall predominantly on out-of-state interests. Yamaha, 401 F.3d at 569. Nondiscriminatory measures "are generally upheld, in spite of [some burden] on interstate commerce," if local economic interests are also affected by the statute because burdened in-state interests can be relied upon to prevent legislative abuse by a state legislature. Id. (citing W. Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 200 (1994)). Thus, when there are only out-of-state burdens, and few or no adversely affected in-state interests, Pike balancing serves as a check against legislative abuse.

Plaintiffs argue that the burdens on interstate commerce imposed by the Ethanol Blending Statute far outweigh any local benefits, or at the very least, that there is a genuine issue of material fact as to whether this is the case. Plaintiffs cite several "significant burdens" in support of this

38

argument: supply disruptions, storage disruptions, and inefficient product segregations. Plaintiffs argue these burdens will be magnified if similar laws to the Ethanol Blending Statute are passed in other states. Plaintiffs argue that any ostensible local benefits from the Ethanol Blending Statue are illusory at best, that the possible benefits of allowing marketers to participate in the RIN market do not have economic benefit, and that there is no evidence for the state's argument that the statute might lead to increased business for local ethanol producers.

The court finds that the stipulations of the parties foreclose plaintiffs' arguments regarding the significant burdens of the Ethanol Blending Statute, and that contrary to plaintiffs' assertions, there is no material factual question as to the law's burden on interstate commerce and its ostensible local benefits. As to plaintiffs' suggestion that the Ethanol Blending Statute *could* lead to supply disruptions or run-outs, the evidence in the record shows this has not happened since the statute has been in effect. (Stip. ¶ 48, 69.) Additionally, as defendant and intervenor-defendant point out, the parties have stipulated that suppliers have numerous mechanisms in place to forecast the amount of fuel they must supply. (Id. ¶ 67.) In fact, suppliers "require Marketers to inform them of their estimated needs for gasoline products approximately one month in advance." (Id.) Even if shipping gasoline from the Gulf Coast to North Carolina terminals takes approximately 15 to 25 days as plaintiffs state, the mechanisms suppliers have in place to forecast demand alleviate the danger of a "run out."

As for storage disruptions, plaintiffs' primary argument is that there is an undue burden created by effectively requiring suppliers to ship unblended full-octane gasoline, a product they "otherwise would not" ship. (Pls.' Mem. Opp. 30.) But plaintiffs' brief also reveals that they acknowledge that regardless of the requirements imposed by the Ethanol Blending Statute or how

much they would prefer to ship only blendstock, suppliers will ship a form of unblended full octane gasoline to North Carolina that is suitable for certain boating and two-stroke engine applications. (Id. at 32.) Arguments that suppliers suffer an undue burden from having to ship multiple products along the pipelines, resulting in storage disruptions or insufficient product segregations, do not ring true based on plaintiffs own acknowledgment of what products they would ship with or without the Ethanol Blending Statute.[15]

Additionally, plaintiffs have not shown that shipping unblended gasoline in addition to the various other gasoline products currently shipped has resulted in any storage difficulties at the various terminals; they only speculate that such problems might occur. While plaintiffs suggest that it could reduce cost if suppliers only had to ship sub-octane blendstock, they freely acknowledge that they will not just ship sub-octane blendstock even if given the choice to do so.[16] Plaintiffs place much on the argument that most suppliers have reduced the frequency and size of the shipments of full octane gasoline to other states. But the crux of plaintiffs' argument regarding a burden on interstate commerce is that they have to ship unblended gasoline at all, and the record clearly reveals

---

[15] This conclusion is bolstered by the fact that suppliers ship unblended full octane gas to states without statutes like the Ethanol Blending Statute. (Stip. ¶ 63.)

[16] Additionally, as defendant and intervenor-defendant point out, the stipulations reveal that suppliers could produce conventional, unblended gasoline at the terminal by mixing two CBOB products, and possibly avoid the Ethanol Blending Statute altogether. While the court does not address the question of whether this would be outside of the purview of the Ethanol Blending Statute, the fact remains that this would be a possible way to ship only blendstock to North Carolina, thus promoting the efficient product segregation plaintiffs contend the Ethanol Blending Statute thwarts. Additionally, to the extent plaintiffs rebut this point by arguing that selling blendstock or CBOB would require them to sell an unfinished product to marketers that would compromise trademarked suppliers' product integrity, this argument is undercut by the various stipulations that demonstrate suppliers currently sell blendstock. (Stips. ¶¶ 29, 39, 40, 41, 42.)

that suppliers ship unblended gasoline in states with and without statutes like the Ethanol Blending Statute, and that suppliers will continue to ship full octane gasoline with or without the statute.[17]

Having found no undue burden, the court now turns to the <u>Pike</u> balancing of the putative local benefits. As noted above, at this step, the court applies a rational basis level of scrutiny to the state law and is deferential to the North Carolina legislature regarding the putative state benefits. As a preliminary matter, the court finds a rational basis for the Ethanol Blending Statute. The state has a rational interest in promoting the use of blended fuel and reducing dependence on imported oil. <u>See</u> N.C. Gen. Stat. § 75-90(c) (citing these goals in the plain language of the statute). The Ethanol Blending Statute helps the state realize these goals by giving businesses within its borders the opportunity to participate in blending and possibly promoting the production of renewable fuels within the state. Additionally, the statute does not require that suppliers sell only unblended fuel, rather it requires that if suppliers sell unblended gasoline, that marketers have the option of purchasing it.

This court has already alluded to the various putative local benefits of the Ethanol Blending Statute in its previous order. The plain language of the Ethanol Blending Statute, which speaks of reducing dependence on foreign oil, suggests a rationale for its enactment not unlike that of Congress in enacting the federal renewable fuel program. <u>Am. Petroleum Inst.</u>, 681 F.Supp.2d at 645. Without the statute, it would be possible for suppliers to monopolize blending of fuel, completely excluding local marketers from participating in the blending process. With the Ethanol

---

[17] Plaintiffs attempt to bolster their argument by raising the possibility of other states passing laws like the Ethanol Blending Statute and arguing that this could magnify the impact on interstate commerce to the level of an undue burden. In support, they cite <u>Hunt v. Washington State Apple Adver. Comm'n</u>, 432 U.S. 333, 338 (1977). However, <u>Hunt</u> involved a statute that clearly discriminated against an out-of-state actor in favor of in-state actors, a practice the court has found has not occurred here. 432 U.S. at 350. Having found that the Ethanol Blending Statute is not discriminatory, the court finds <u>Hunt</u> distinguishable.

Blending Statute, local marketers are at the very least given the option to blend fuels if they are interested in participating in the program and if it is economically in their interest to do so. The record shows that having this option has helped local marketers in difficult economic times. (See Holmes Testimony ¶ 27.) The overall effect of the statute is to allow more entities to blend fuel, thus promoting the use of a renewable source of fuel consistent with federal objectives.

Plaintiffs' arguments that there are few local benefits compared with the burdens on interstate commerce fall short. There is simply no evidence that allowing marketers to participate in the RIN trading program has held suppliers hostage to the RIN market (Stips. ¶¶ 128-133.) Similarly, plaintiffs do not dispute the evidence in the record that marketers who exercise the option to blend fuel can and have passed along the benefits of blending, i.e. lower prices, to consumers in economically difficult times. (Holmes Testimony ¶ 26.)

Finally, under the Pike balancing, where the burden created by the Ethanol Blending Statute is primarily on out of state suppliers (because all suppliers are out of state), the court asks whether the Ethanol Blending Statute creates any burden on local interests, as the existence of such would lessen any perceived legislative abuse in the statute. Blending gasoline with ethanol is not popular with all consumers. (Stip. ¶ 64.) Furthermore, blending is prone to error, and the record is rife with evidence that blending, whether by splash blending or inline blending, can compromise the content of gasoline sold to consumers. (Stips. ¶¶ 86-121.) The Ethanol Blending Statute imposes burdens on local interests by forcing marketers to weigh the possible benefits of blending against the risks of losing potential customers and incurring liability for blending errors. These burdens suggest that the North Carolina legislature was not engaging in legislative abuse when it enacted the Ethanol Blending Statute, but rather was giving local marketers the option of participating in the sale of

42

gasoline blended with renewable fuel that enables them to possibly enjoy certain tax credits, ultimately promoting the use, sale, and consumption of renewable fuel in North Carolina. Accordingly, under Pike, the court finds no undue burden on interstate commerce as a result of the Ethanol Blending Statute. Any burden is further outweighed by the potential putative local benefits of the statute, and as applied, no dormant commerce clause violation is found.

As such, defendant's and intervenor-defendant's motions for summary judgment on plaintiffs' Commerce Clause claim are GRANTED.

## CONCLUSION

For the foregoing reasons, the court GRANTS defendant's and intervenor-defendant's motions for summary judgment as to plaintiffs' as-applied challenge. (DE ## 84, 86.) No further claims or issues remaining, the Clerk is DIRECTED to close this case.

SO ORDERED, this the 16th day of December, 2011.

_____
LOUISE W. FLANAGAN
United States District Judge

43